**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**JAMES E. AVERY,**

                              **Plaintiff,**


        v.                                              **1:10-CV-264**
                                                            **(FJS)**


**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

                              **Defendant.**


_____

**APPEARANCES**                          **OF COUNSEL**

**OFFICE OF ALEX C. DELL**               **GEORGE P. FERRO, ESQ.**
450 New Karner Road
Albany, New York 12205
Attorneys for Plaintiff


**SOCIAL SECURITY ADMINISTRATION**        **BENIL ABRAHAM, ESQ.**
**OFFICE OF GENERAL COUNSEL**
26 Federal Plaza, Room 3904
New York, New York 10278-0004
Attorneys for Defendant


**SCULLIN, Senior Judge**

**MEMORANDUM-DECISION AND ORDER**

# I. INTRODUCTION

Plaintiff brought this action pursuant to the Social Security Act (the "Act"), 42. U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner"), denying his applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff requests that the Court reverse the Administrative Law Judge's ("ALJ") decision or remand the case to the ALJ.

Currently before the Court are Plaintiff's and Defendant's cross-motions for judgment on the pleadings or, in the alternative, for summary judgment. *See* Dkt. Nos. 14, 15.

# II. BACKGROUND

A.      **Procedural history**

On May 30, 2007, Plaintiff filed applications for DIB and SSI benefits, citing a torn rotator cuff as his disabling condition. *See* Administrative Record ("AR") at 99-106. In both applications, Plaintiff alleged an onset date of January 1, 2007. *See id.* at 99, 103. The Social Security Administration denied his applications on August 30, 2007, and Plaintiff thereafter filed a timely request for a hearing before an ALJ on October 5, 2007. *See id.* at 71-78. ALJ Arthur Patane conducted that hearing in Albany, New York on March 23, 2009. *See id.* at 41-63. Plaintiff appeared with legal counsel and testified. *See id.*

In a decision dated June 23, 2009, ALJ Patane denied Plaintiff's claims for DIB and SSI benefits. *See id.* at 10-18. ALJ Patane stated that he considered all of the evidence in the record and made the following findings:

1) Plaintiff had not engaged in substantial gainful activity since January 1, 2007, the alleged onset date.

2) Plaintiff had the following severe impairment: right rotator cuff tear.

3) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").

4) Plaintiff had the residual functional capacity ("RFC") to perform the full range of light work.

5) Plaintiff was unable to perform his past relevant work.

6) Plaintiff was born on April 9, 1962. When he applied for DIB and SSI, Plaintiff was forty-four years old which is defined as a younger individual aged eighteen to forty-nine.

7) Plaintiff had a limited education and communicated in English.

8) Transferability of job skills was not material because the Medical-Vocational Guidelines (the "Grids") in 20 C.F.R. Part 404, Subpart P, Appendix 2 directly supported a finding of "not disabled."

9) In light of Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

10) Plaintiff had not been under a disability as defined by the Act since January 1, 2007, the alleged onset date.

*See* AR at 12-17.

The ALJ's decision became the Commissioner's final decision on July 21, 2009, when the

Appeals Council denied Plaintiff's request for review. *See id.* at 1-3.

On March 1, 2010, Plaintiff commenced this action. *See* Dkt. No. 1. He filed a

supporting brief on March 8, 2010.[1] *See* Dkt. No. 14. Defendant thereafter filed an answer on

October 4, 2010, *see* Dkt. No. 9, and a brief in opposition on April 21, 2011, *see* Dkt. No. 15.


**B.     Plaintiff's medical history**

Plaintiff was treated at North Dutchess Hospital in Rhinebeck, New York, on August 20,

2006, for a right shoulder injury that he sustained at work. *See* AR at 182-86. Plaintiff alleged

that his injury caused radiating pain down his arm. *See id.* at 185. An x-ray of Plaintiff's right

shoulder showed no acute fracture or dislocation, preserved joint spaces, and no abnormal

calcifications. *See id.* at 187. Plaintiff was issued a sling, advised not to work, and released that

day. *See id.* at 183, 205.

On August 24, 2006, Dr. William Kwock, an orthopedic surgeon, began treating Plaintiff

for his shoulder injury. *See id.* at 205-06, 251-52, 272-73, 275-76. Upon examination, Dr.

Kwock found (a) tenderness in the anterior portion of Plaintiff's right rotator cuff; (b) a

moderately limited range of motion with an abduction of 80 degrees and a flexion of 90 degrees;

and (c) no bone and joint abnormalities. *See id.* at 205, 251, 272, 275. As such, Dr. Kwock's

initial impression was a right shoulder sprain; and he ruled out a rotator cuff tear. *See id.* at 206,

252, 273, 276. He prescribed medication and physical therapy and requested a magnetic

resonance imaging ("MRI") of Plaintiff's right shoulder. *See id.*

_____

[1] Although Plaintiff identified as one of his issues "[w]hether the Appeals Council erred in denying review of the Unfavorable Decision issued by Administrative Law Judge Arthur Patane on June 23, 2009," s*ee* Plaintiff's Brief at 1, in effect he is appealing the ALJ's decision, which became the Commissioner's final decision when the Appeals Council denied review of that decision.

Following an MRI on September 6, 2006, Plaintiff returned to Dr. Kwock. *See id.* at 203-04, 249, 263. The MRI showed (a) a compromised subacromial space secondary to acromioclavicular joint ("AC joint") athropatic changes that impressed on the subjacent supraspinatus; (b) severe degree of supraspinatus tendinosis; and (c) no labral capsular abnormality. *See id.* Plaintiff, however, reported "much improvement" in his shoulder with rest and medication. *See id.* at 203, 258. Dr. Kwock released Plaintiff to regular duty work without restrictions as of October 2, 2006. *See id.*

On October 6, 2006, Plaintiff went to Columbia Memorial Hospital in Hudson, New York, complaining of right shoulder pain. *See id.* at 189. An examination of his shoulder showed, among other things, a normal range of motion in all four extremities, no drop arm sign, and no creptius with active or passive range of motions. *See id.* Plaintiff was discharged in stable condition and advised to return to work the next day with the following restrictions: (a) avoid use of his right upper extremity; (b) no lifting greater than ten pounds; (c) no repetitive use of the right arm; and (d) no overhead work. *See id.* at 190.

On November 3, 2006, Dr. Marc Bergeron, an orthopedic surgeon, performed an independent medical examination of Plaintiff at the direction of the New York State Worker's Compensation Board. *See id.* at 194-97, 222-25, 243-46, 292-95. Dr. Bergeron examined Plaintiff's right shoulder, finding, among other things, (a) normal contour and no atrophy; (b) an abduction of 90 degrees, elevation of 140 degrees, and external rotation of 70 degrees; (c) subacromial creptiance; (d) prominence and tenderness in the AC joint; and (e) tenderness over the lateral and anterior aspect of the subacromial space. *See id.* at 195, 223, 244, 293. Dr. Bergeron, therefore, opined that Plaintiff suffered from a right shoulder sprain with evidence of

partial tear, tendinopathy, and pre-existing degenerative change of the AC joint. *See id.* Dr.

Bergeron further noted that Plaintiff had been working full-time with no restrictions for

approximately one month. *See id.* at 194, 222, 243, 292. Although Plaintiff remained

symptomatic, Dr. Bergeron found no disability. *See id.* at 196, 224, 245, 294. He recommended

that Plaintiff continue his home exercise program and use over-the-counter anti-inflammatory

medications. *See id.* at 195, 223, 244, 293.

Between November 2006 and August 2007, Dr. Kwock treated Plaintiff's shoulder pain

with steroid injections, physical therapy, and prescription medication (i.e., Arthotec and

Vicodin). *See id.* at 192-93, 201, 229, 232, 241, 282-84, 289. During this period, Dr. Kwock's

physical examinations generally revealed (a) a mild to moderately weak flexion and abduction;

(b) mild limitation in internal and external rotation; (c) abduction between 80 to 90 degrees; (d)

elevation between 150 to 170 degrees with pain; and (e) tenderness on the infraspinatus tendon.

*See id.* Further, Plaintiff reported good and/or immediate pain relief after almost every steroid

injection that he received in his right shoulder. *See id.* at 192-93, 229, 283-84, 289.

On August 2, 2007, Dr. Gregory B. Shankman, an orthopedic surgeon, conducted a

second independent medical examination of Plaintiff at the direction of the New York State

Worker's Compensation Board. *See id.* at 149-52, 215-17, 290-91. Plaintiff's examination

showed, among other things, an abduction, flexion, and internal and external rotation of 90

degrees, and good muscle strength with intact infraspinatus, supraspinatus, and subscapularis

muscles. *See id.* at 150, 216, 291. Dr. Shankman diagnosed Plaintiff with a right rotator cuff

tear related to his workplace injury the previous year. *See id.*

Similarly, Dr. Amelita Balagtas, a consultative orthopedic surgeon, diagnosed Plaintiff with "[r]ight shoulder pain; rule out rotator cuff tear" on August 21, 2007. *See id.* at 279. Plaintiff accounted that steroid injections provided temporary pain relief in his shoulder pain. *See id.* Dr. Balagtas also found that Plaintiff had tenderness in the anterior portion of his right shoulder, and his range of motion was 90 degrees for both abduction and elevation. *See id.* at 280. Dr. Balagtas, however, found no joint inflammation, effusion, or instability, muscle atrophy, and sensory abnormalities. *See id.*

Between August 2007 and May 2008, Plaintiff returned to Dr. Kwock approximately five times for treatment of his "on and off" right shoulder pain. *See id.* at 284, 288, 307-10. Dr. Kwock's physical examinations generally showed (a) mildly weak flexion and abduction; (b) mild limitations in internal and external rotation; (c) an abduction of 90 degrees; (d) elevation between 165 to 170 degrees with pain; and (e) tenderness on the anterior portion of the rotator cuff and AC joint. *See id.* During this time, Plaintiff declined operative treatment; and Dr. Kwock twice noted that Plaintiff was "temporarily partially disabled." *See id.* 284, 288, 309-10. Plaintiff also continued to report reduced pain and increased mobility following steroid injections. *See id.* at 284, 288, 310.

Dr. C.T. Gorczynski, an orthopedic surgeon, also treated Plaintiff three times between August 2008 and March 2009 for his shoulder pain. *See id.* at 311-22. On August 14, 2008, Dr. Gorczynski noted Plaintiff appeared healthy and lacked signs of acute distress. *See id.* at 311-12. Plaintiff's forward elevation was to 170 degrees and his external rotation was to 70 degrees. *See id.* His AC joint was tender to palpation and his rotator cuff strength was 5/5 with pain. *See id.* Dr. Gorczynski made similar findings after examining Plaintiff on September 29, 2008. *See id.*

at 314-16.  On March 9, 2009, Dr. Gorczynski completed a Workers' Compensation form, finding that Plaintiff had a 75 percent loss in the use of his right upper extremity.  *See id.* at 320-21.  Dr. Gorczynski released Plaintiff to light duty work despite his inability to perform work requiring the use of his right upper extremity.  *See id.*

Although Plaintiff denied respiratory symptoms and talked in complete sentences without shortness of breath during his visit to Dr. Gorczynski on March 9, 2009, a physician's assistant at Columbia Memorial Hospital diagnosed Plaintiff with acute bronchitis and treated him with steroids and an inhaler on March 17, 2009.  *See id.* at 317, 324-26.  Plaintiff alleged that he had had bronchitis-like symptoms since approximately October 2008.[2]  *See id.* at 61.

On May 14, 2009, Dr. Balagtas again examined Plaintiff on consultation, concluding that Plaintiff had moderate limitations in lifting, carrying, and reaching involving the right upper extremity.  *See id.* at 329-31.  Plaintiff's range of motion was limited to 130 degrees of forward elevation, 30 degrees internal rotation, and 40 degrees of external rotation.  *See id.* at 330.  Although anterior right shoulder tenderness existed, Dr. Balagtas found no joint inflammation, effusion, or instability.  *See id.*

Furthermore, on May 18, 2009, Dr. Balagtas completed a medical source statement, finding that Plaintiff could (a) occasionally lift up to twenty pounds; (b) sit, stand, and walk up to eight hours for each activity in an eight-hour day; and (c) occasionally reach, push, and pull with the right arm.  *See id.* at 332-38.  Dr. Balagtas determined that Plaintiff suffered no postural

_____

[2] At the hearing on March 23, 2009, Plaintiff testified that he had suffered from bronchitis since "the beginning of winter."  *See* AR at 61.  In his brief, however, Plaintiff argued that he suffered from bronchitis-like symptoms "beginning in October 2009."  *See* Plaintiff's Brief at 3.  The Court, therefore, assumes Plaintiff intended to claim "October 2008" as the alleged onset date for his bronchitis.

limitations (e.g., climbing stairs or ladders, balancing, kneeling, or crouching), and he could shop, travel without a companion, ambulate without assistance, walk one block at a reasonable pace, use standard public transportation, prepare simple meals, maintain his personal hygiene, and sort, handle, and use paper/files. *See id.* at 335, 337.

## III. DISCUSSION

**A.     Standard of review**

*1. Substantial evidence*

When reviewing the Commissioner's final decision, the district court may set aside the Commissioner's non-disability determination "only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted); *see also Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir. 2004) (stating the court "must determine whether the correct legal standards were applied and whether substantial evidence supports the decision" (citation omitted)).  The court's factual review of the Commissioner's decision is limited to whether substantial evidence in the record supports the decision.  *See* 42 U.S.C. § 405(g); *see also Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).  The Supreme Court has defined substantial evidence to mean "more than a mere scintilla" of evidence and "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted).  An ALJ must also set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *See Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir. 1984).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). A court, however, cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *See* 42 U.S.C. § 405(g); *Scott v. Comm'r of Soc. Sec.*, No. 06-CV-481, 2009 WL 1559819, *2 (N.D.N.Y. June 2, 2009).

Additionally, the district court may not affirm an ALJ's disability determination if it reasonably doubts whether the ALJ applied the proper legal standards, even if it appears that substantial evidence supports that determination. *See Pollard v. Halter,* 377 F.3d 183, 188-89 (2d Cir. 2004) (citation omitted); *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987). "'Failure to apply the correct legal standards is grounds for reversal.'" *Pollard,* 377 F.3d at 189 (quotation omitted).

### 2. Five-step determination of disability

To be eligible for DIB and SSI, a claimant must show that he suffers from a disability within the meaning of the Act. The Act defines "disability" as an inability "to engage in substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to cause death or last for twelve consecutive months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In addition, a claimant's

[p]hysical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In evaluating DIB and SSI claims, the ALJ follows a five-step sequential evaluation process:

First, the [ALJ] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [ALJ] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [ALJ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [ALJ] then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 20 C.F.R. §§ 404.1520, 416.920.

The claimant bears the burden of proving disability at the first four steps. *See Berry*, 675 F.2d at 467. If the claimant meets this burden, then the Commissioner has the burden of proof at the fifth step. *See id.*

**B.     The ALJ's Step Two determination**

At Step Two of the five-step sequential evaluation process, the ALJ must determine whether a claimant has a severe impairment that significantly limits his physical or mental ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). To be "severe," a claimant's impairment must last or be expected to last for a continuous period of twelve months. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The impairment must also render a claimant unable to engage in substantial gainful activity for the same continuous twelve-month period. Importantly, the "'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" *Flagg v. Astrue*, No. 5:11-CV-00458, 2012 U.S. Dist. LEXIS 126708, *18 (N.D.N.Y. Sept. 6, 2012) (quotation omitted). "Indeed, a 'finding of not severe should be made if the medical evidence establishes only a slight abnormality which would have no more than a minimal effect on an individual's ability to work.'" *Id.* (quoting *Bowen*, 482 U.S. at 154 n.12) (other citations omitted).

In this case, Plaintiff contends that the ALJ erred by not considering whether his acute bronchitis constituted a severe impairment. *See* Plaintiff's Brief at 3. The ALJ, however, correctly omitted evaluating whether Plaintiff's bronchitis was a severe impairment for the following reasons.

First, the ALJ limited his review to Plaintiff's torn rotator cuff when making his disability determination because Plaintiff did not assert[3] bronchitis (or any respiratory condition) as a disabling impairment until his brief to this Court. *See* Plaintiff's Brief at 3; AR at 61. The

---

[3] Plaintiff simply testified at the hearing that his bronchitis hurt in his chest when he swept floors at two commercial office buildings where he worked part-time. *See* AR at 61.

Northern District of New York addressed a similar situation in *Mancuso v. Comm'r of Soc. Sec.*, No. 1:06-CV-930, 2008 U.S. Dist. LEXIS 17453 (N.D.N.Y. Mar. 6, 2008). In *Mancuso*, the claimant argued that the ALJ failed to consider whether her obesity was a severe impairment. *See id.* at *16. However, because the claimant had not alleged obesity as a disabling impairment until she filed her brief, the court (Sharpe, J.) determined, in part, that the ALJ did not err by failing to address the claimant's obesity. *See id.*; c*f. Watson v. Astrue*, No. 08 Civ. 1523, 2010 U.S. Dist. LEXIS 39717, *8 (S.D.N.Y. Apr. 22, 2010) (noting that several district courts in the Second Circuit have found that the failure to raise an issue before an ALJ waives that issue's review by the district court (citing *Carvey v. Astrue*, 2009 U.S. Dist. LEXIS 90974, 2009 WL 3199215, *14 (N.D.N.Y. Sep. 30, 2009) ("The failure to present an argument to the ALJ constitutes waiver of the right to raise it on appeal.")) (other citations omitted). The Court draws the same conclusion in this case.

Second, even if Plaintiff had timely asserted bronchitis as disabling impairment, this alleged condition would fail the twelve-month durational requirement. *See* 20 C.F.R. §§ 404.1509, 416.909 (stating that an impairment "must have lasted or must be expected to last for a continuous period of at least 12 months"). At the time of the hearing, Plaintiff had been diagnosed with acute bronchitis for only six days and allegedly had been suffering bronchitis-like symptoms for approximately five months. *See* AR at 61, 323. The record also shows that Plaintiff's bronchitis was treatable with medication and not expected to last more than twelve months. *See Stokes v. Astrue*, No. 7:10-CV-1129, 2012 U.S. Dist. LEXIS 27016, *36 (N.D.N.Y. Mar. 1, 2012) (stating that "a condition that improves and is repairable may not be considered a disability for purposes of disability benefits" (citation omitted)). Indeed, the physician's assistant

who diagnosed Plaintiff on March 17, 2009, (a) treated him with steroids and an inhaler; (b) estimated that he would experience relief within two to three days; and (c) noted that a cough caused by bronchitis often lasts only three to four weeks. *See* AR at 323-28.

Finally, there is no evidence that Plaintiff's bronchitis affected his ability to perform substantial gainful activity. A plaintiff's mere diagnosis, without more, does not automatically render his bronchitis a severe condition. *See Pollard v. Astrue*, No. 07-CV-440, 2009 U.S. Dist. LEXIS 60619, *11 (N.D.N.Y. May 27, 2009) (stating that, "[a]lthough Plaintiff's medical records indicate that she was periodically noted to suffer from asthma and bronchitis, . . . there is no indication that these conditions are severe or would even arguably interfere with Plaintiff's ability to perform work" (internal citation and footnote omitted)). Plaintiff offered no medical evidence to prove his bronchitis was a severe impairment, and a review of the record shows that Plaintiff does not have a history of bronchitis or other respiratory conditions. *See* AR at 323-28. Despite his bronchitis, Plaintiff also worked part-time for eighteen months cleaning two commercial offices. *See id.* at 61-62.

Accordingly, "[i]n view of the lack of evidence showing that [P]laintiff's [bronchitis] persisted for twelve continuous months *and* prevented him from pursuing substantial gainful activity during that same time, the ALJ correctly excluded [P]laintiff's [bronchitis] from his disability analysis." *Iannopollo v. Barnhart*, 280 F. Supp. 2d 41, 47 (W.D.N.Y. 2003) (citing *Bianchi*, 764 F.2d at 45 (removing from the disability analysis plaintiff's foot condition because it developed just prior to the ALJ's hearing, it was amenable to treatment, and evidence did not exist that it would persist with treatment)) (other citations omitted). The Court thus upholds the ALJ's Step Two determination.

**C.     The ALJ's credibility determination**

An ALJ may properly reject a claimant's subjective complaints of pain, symptoms, and limitations "'after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quotation omitted). Reviewing courts should afford deference to an ALJ's credibility determination because he heard the testimony and observed the witnesses' demeanor. *See Cohn v. Astrue,* No. 10-CV-214, 2012 U.S. Dist. LEXIS 43849, *15 (N.D.N.Y. Mar. 29, 2012) (holding that "[t]he ALJ's decision to discount Plaintiff's statements of symptoms must be accepted by a reviewing court unless it is clearly erroneous" (citation omitted)). The ALJ, however, must set forth the reasons for his credibility determination "with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." *Raynor v. Astrue*, No. 1:09-CV-227, 2011 U.S. Dist. LEXIS 117101, *5 (N.D.N.Y. Oct. 7, 2011) (citing *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)); *see also Valet v. Astrue*, No. 10-CV-3282, 2012 U.S. Dist. LEXIS 7315, *65-*66 (E.D.N.Y. Jan. 23, 2012) (stating remand is appropriate where "the ALJ fails sufficiently to explain a finding that the claimant's testimony was not entirely credible" (citation omitted)).

In assessing credibility, the ALJ performs a two-step analysis. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Crouch v. Comm'r, Soc. Sec.,* No. 6:01-CV-0899, 2003 U.S. Dist. LEXIS 16254, *29 (N.D.N.Y. Sept. 11, 2003) (citations omitted). First, based upon the objective medical evidence, the ALJ determines whether the impairments "'could reasonably be expected to produce the pain or other symptoms alleged.'" *Crouch,* 2003 U.S. Dist. LEXIS, at *29 (quoting 20 C.F.R. §§ 404.1529(a), 416.929(a)). Second, if the objective medical evidence alone

establishes such impairments, then the ALJ evaluates the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's ability to work. *See id.* at *30 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering other factors, such as daily activities, the location, duration, frequency and intensity of symptoms, the type, effectiveness and side effects of medication, and other treatment or measures to relieve those symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

In this case, the gravamen of Plaintiff's objection is that the ALJ improperly disregarded his subjective complaints of pain, physical limitations, and bronchitis-related symptoms when finding that he retained the RFC to perform light work.[4] *See* AR at 13. The ALJ specifically found that, although Plaintiff's right shoulder injury could produce some of the alleged pain and limitations, his allegations about the intensity, persistence, and limiting effects of his condition were not wholly credible to the extent that they were inconsistent with his RFC determination. *See id.* In reaching this finding, the ALJ reasonably relied on the objective medical conclusions of Drs. Balagtas, Kwock, and Shankman. *See id.* at 13-15. A summary of this evidence follows.

First, Dr. Balagtas, a consultative physician specializing in physical medicine and rehabilitation, examined Plaintiff on August 21, 2007, finding that he had moderate limitations in using his right shoulder to lift, carry, and reach. *See* AR at 281; *cf. Petrie v. Astrue,* 412 F. App'x

---

[4] Light work requires an ability to lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Also, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." *See* Social Security Ruling 83-10, 1983 SSR LEXIS 30, *14 (1983).

401, 405 (2d Cir. 2011) (holding that "[t]he report of a consultative physician may constitute such substantial evidence" (citation omitted)). Although Dr. Balagtas' conclusion remained unchanged after a follow-up examination on May 14, 2009, she noted an improvement in Plaintiff's range of motion for forward elevation. *See* AR at 330-31. Also, according to Dr. Balagtas' medical source statement, Plaintiff could (1) occasionally lift up to twenty pounds and carry up to ten pounds; (2) sit, stand, and walk for eight hours in an eight-hour workday; and (3) occasionally reach (including overhead) and push/pull with his right hand. *See id.* at 332-34.

The findings of Dr. Kwock, a treating orthopedic surgeon, were consistent with Dr. Balagtas' conclusions. Indeed, Dr. Kwock noted slight improvement in Plaintiff's forward range of motion on May 8, 2008. *See id.* at 310. Although Plaintiff complained of pain, he reported to Dr. Kwock that prescription medication and steroid injections helped to alleviate his shoulder pain and increased his mobility. *See id.* at 193, 201, 203, 283-84, 308, 310. Plaintiff declined Dr. Kwock's operative treatment recommendation because no physician could guarantee that surgery would fix his pain. *See id.* at 54, 284, 288.

Dr. Shankman performed an independent medical examination of Plaintiff in connection with his Worker's Compensation claim on August 2, 2007. Plaintiff complained of right shoulder soreness and difficulty reaching overhead and lifting objects but reported that six weeks of physical therapy helped him. *See id.* at 290. Although Dr. Shankman diagnosed Plaintiff with a right torn rotator cuff related to his work injury, he noted that Plaintiff had good muscle strength in his upper extremities, intact infraspinatus, supraspinatus, and subacapularis muscles, and no apparent swelling. *See id.* at 291.

In addition to objective medical evidence, the ALJ discussed Plaintiff's daily activities in evaluating his credibility. *See id.* at 15. The ALJ specifically noted that Plaintiff was independent with respect to self-care, grooming, and dressing. *See id.* According to the Activities of Daily Living form that Plaintiff completed on July 18, 2007, his typical day included waking up, taking medicine, attempting to work for a couple of hours, watching television, going for a walk, reading the newspaper, preparing simple meals, and drinking coffee. *See id.* at 137. With his left arm, Plaintiff could care for his hair, shave, feed himself, and use the toilet. *See id.* at 138. He also performed indoor and outdoor household chores, such as cleaning dishes, vacuuming, washing laundry, and mowing the yard with a self-propelled lawnmower. *See id.* Without any assistance, Plaintiff left his home daily, shopped weekly, and drove. *See id.* In fact, Plaintiff drove himself to the hearing on March 23, 2009. *See id.* at 48.

Plaintiff's credibility was further challenged by the fact that he had been working approximately twelve hours per week for Global Services, Inc. cleaning two office buildings with the alleged disability. *See id.* at 57-59; *see also House v. Comm'r of Soc. Sec.*, No. 09-CV-913, 2012 U.S. Dist. LEXIS 40845, *33 (N.D.N.Y. Feb. 29, 2012) (stating that "the ALJ's consideration of [p]laintiff's part-time work was entirely proper and supported his decision to discount [p]laintiff's credibility") (citing 20 C.F.R. §§ 404.1571, 416.971 (stating that even though part-time work does not constitute substantial gainful activity, it may show that a claimant is able to do more work than actually performed)). In fact, he had been working as a part-time office cleaner for approximately eighteen months before the hearing. *See* AR at 61-62. Although he testified that he tried not to use his right arm, he still swept, mopped, and emptied the trash. *See id.* at 58-59.

In sum, the ALJ's credibility determination was grounded in the evidence and articulated in his decision. Having outlined the evidence before him, the ALJ satisfied his duty to state his findings of fact and conclusions of law. Accordingly, the Court finds that the ALJ did not err by discrediting Plaintiff's subjective complaints of pain, limitations and symptoms.

**D.      The ALJ's Step Five determination**

At Step Five, the ALJ considers a claimant's vocational factors (age, education, and work experience), together with his RFC, to determine whether he can perform work that exists in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g). The ALJ may rely on the Grids[5] at Step Five where the claimant's limitations have not significantly compromised his occupational base. *See* 20 C.F.R. §§ 404.1569a(d), 416.969a(d) (providing that, where a claimant suffers from exertional and non-exertional limitations, the ALJ may use the Grids to determine whether the claimant can perform other work); 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e) (providing that, where a claimant has strength limitations and non-exertional limitations, the ALJ may evaluate his work ability in light of the Grids). The Second Circuit has held that, if a claimant experiences exertional and non-exertional limitations and the non-exertional limitations significantly narrow the claimant's occupational base, exclusive reliance on the Grids may be precluded. *See Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999); *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986). In these circumstances, a vocational

_____

[5] The Grids classify work into five exertional categories ranging from sedentary to very heavy, based upon physical abilities and strength. *See* 20 C.F.R. § 404.1567(a). Each exertional category has its own grid, which then considers a claimant's age, education, and work experience, directing a decision of "disabled" or "not disabled" when the claimant's particular characteristics are applied to the Grid categories. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 §§ 200.00(a), 404.1569.

expert's testimony may be needed to determine whether jobs exist in the national economy that a claimant can perform. *Bapp*, 802 F.2d at 603. "[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the [Grids]." *Id.* Indeed, a vocational expert's testimony is required only where "a claimant's nonexertional impairments significantly diminish his ability to work – over and above any incapacity caused solely from exertional limitations – so that he is unable to perform the full range of employment indicated by the [Grids.]" *Id.* Courts assess the need for a vocational expert "on a case-by-case basis." *Id.* at 605.

Here, the ALJ relied exclusively on the Grids — namely Rule 202.18[6] — to conclude that jobs exist in significant numbers in the national economy that Plaintiff could perform. *See* AR at 8. As Rule 202.18 requires, the ALJ assessed Plaintiff's age, education, work experience, and RFC, finding that (1), at age forty-four on his alleged onset date, Plaintiff was a younger individual; (2) he did not complete high school; (3) he communicated in English; (4) the transferability of his skills was immaterial; and (5) he had the RFC to perform the full range of light work. *See* AR at 17. The Grid, therefore, directed a non-disability determination because Plaintiff could perform other substantial gainful work existing in the national economy.

Contrary to Plaintiff's contentions, his alleged non-exertional limitations, namely pain, fatigue, and lack of endurance, did not compel the ALJ to consult a vocational exert because (1) the record is void of medical evidence to support that he had such limitations; and (2), even if he did have said limitations, they did not significantly diminish his ability to work. *See Zabala v.*

---

[6] Rule 202.18 applies to claimants between the ages of eighteen and forty-nine with a limited education whose prior work is skilled or semi-skilled and whose skills are not transferable. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

*Astrue*, 595 F.3d 402, 410-11 (2d Cir. 2010) (finding that "'the mere existence of a nonexertional impairment does not automatically . . . preclude reliance on the guidelines'" (quotation omitted)). Indeed, at the time of the hearing, Plaintiff had been working approximately twelve hours per week for eighteen months cleaning two office buildings. *See* AR at 57-59. Although Plaintiff testified that he tried not to use his right arm, he still swept, mopped, and emptied the trash at both buildings. *See id.* at 58-59.

Additionally, Plaintiff's reliance on the Sixth Circuit's decision in *Adkins v. Comm'r of Soc. Sec.*, 251 F. App'x 346 (6th Cir. 2007), to support his claim that the ALJ was required to identify specific jobs that he was capable of performing is misguided. The ALJ's proper use of the Grids excused him from introducing "evidence of specific available jobs" that Plaintiff could perform. *Heckler v. Campell*, 461 U.S. 458, 470 (1983) (holding that the Commissioner need not provide "evidence of specific available jobs" that claimant could perform when relying on the Grids); *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009) (concluding the ALJ was not required to identify specific jobs that claimant could perform because the ALJ concluded from the Grids that she was not disabled). Additionally, a complete reading of *Adkins* shows that an ALJ need only "connect the dots between claimant's actual capacity and an actual job in the U.S. economy" when he cannot rely solely on the Grids because claimant's severe impairment was rooted in a non-exertional limitation. *Adkins*, 251 F. App'x at 351. In this case, unlike *Adkins*, substantial evidence in the record showed that Plaintiff's shoulder impairment was not compromised by his alleged pain, fatigue, and lack of endurance, thereby rendering the ALJ's exclusive reliance on the Grids appropriate.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for judgment on the pleadings is **DENIED**; and the Court further

**ORDERS** that Defendant's motion for judgment on the pleadings is **GRANTED**; and the Court further

**ORDERS** that the Commissioner's decision is **AFFIRMED** and Plaintiff's complaint is **DISMISSED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

Dated: October 22, 2012
      Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge